We have five cases on the calendar this morning, a trademark case from the TTAB, three patent cases, one from the district court and two from the PTAB, and a veteran's case. But before we do, we have a pleasant task to perform, and I would ask Judge Moore to make a motion. Okay. Bob, please stand up. I move the admission of Robert King High III, who is a member of the bar and is in good standing with the highest court of Georgia. I have knowledge of his credentials and I'm satisfied he possesses the necessary qualifications. Beyond that, I would just like to add that Bob has been my clerk for the last 20 months. He is king clerk in the chambers, no pun intended, and he's done a wonderful job. It's been a great joy to have him and to watch him grow in his legal skills, his writing, his thinking, and I know that he has a bright future ahead of him and he is going to be a wonderful addition to our bar, and I very much hope that my colleagues will agree and allow his admission. And if there were a way that we could have put some sort of jacket on Luke and claimed that he was a necessary element to this process, he would have been here also. No one else will understand that, but you and I get it. Judge Toronto, having seen some evidence of his work, I would concur. And I certainly do. Judge Moore's recommendations are usually very sound. So, if you would step forward to take the oath. Please raise your right hand. I solemnly swear that you will report yourself as an attorney and counsel of this court, and uprightly and according to law, and that you will support the Constitution of the United States of America. I swear. Welcome to the Bar of U.S. Court of Appeals for the Federal Circuit. Congratulations. Our first case this morning is In Re Ruman Spirits Corporation, 2018-17-12. Mr. – would you pronounce your name for us, please? Yes, Your Honor. My name is Samuel Pamius. Pamius. Yes. We're ready when you are. Thank you. May I please take order? Yes, for the record, Samuel Pamius. As you are aware, this is a trademark case arising from a rejection at the USPTO to register the trademark C. Cañaveral. Due to the existence of another trademark, Cañaveral, Cañaveral, the one that is registered at the USPTO for the argument registrant in this case, is registered in Class 30. Applicant, in this case, is requesting registration for C. Cañaveral in Class 33. But Cañaveral, if I pronounced it properly, is the dominant mark that you want a portion of what you want to register and what already is registered, and so the board found a likelihood of confusion. They look similar. They sound similar. They travel in the same commercial channels. Yes, Your Honor. I understand your question, but I very respectfully defer from their analysis. My main concern is the following. First, their two trademarks are not exactly the same. One is C. Cañaveral with a design, and the other one is a word mark. Admittedly, they both have a similar word, which is Cañaveral. They both share that word. But when you analyze them as a whole... Does that word mean anything in Spanish? Cañaveral means sugar plantation. Okay. Sugar plantation. So they both share and have in common that word, but when you see them as a whole, they both create an overall and distinctive appearance. Well, certainly the red and white C is quite distinctive, but the evaluation of likelihood of confusion is based on a number of facts, and the board found facts, and we give deference to fact-finding. I understand, Your Honor, but in this situation, we believe that you are in the same position as the board, and in the same position as the Trademark Center, and when you analyze all the elements, you will be able, and I feel that you will be convinced that these trademarks can coexist in the same market. Why do I say that? When you analyze the goods that each trademark seeks to protect, that is very, very important. One of them, Registrar's trademark protects candy, chewing gum, ice cream, flavor and sweetened gelatins, honey, pasta, pasta shells, noodles, rice, tortillas, tortilla chips, corn chips, salsa, cheese sauce, tomato sauce, spices, and processed herb and sugar. And the applicant's trademark seeks to protect liquor and rum and rum cream. It's our opinion that these products are in distinctive markets, even when you go to a supermarket. What about the evidence, and I think there were a couple of board findings, that there are candies out there that are liquor infused, and the name is shared with the liquor maker. Thank you for that question, and I believe that evidence further supports our position, and I will explain myself why. I believe that it supports our position since there are very, very limited examples of companies that make candy filled with liqueur, and the companies that make, you have two exhibits in this that were presented. One, some of them are for companies that actually make candy filled with other third parties' liqueurs, and you also have liqueur companies, which I think are the majority of the examples. I think there are five in total. I could be mistaken. The majority show that are like Bailey's and Kahlua, and liqueur companies that decided to make a special candy filled with their liqueur. So I think that is distinctive because it shows that rather than being the rule, that's the exception to the rule, and the fact that there are companies, very limited amount of the companies will make candy filled with liqueur or that consumers encounter these products regularly in the market together or that they make an association right away. The problem for you is you're saying that, but you didn't introduce evidence of that, and the board did rely on evidence of the same company making both the candy and the liqueur substantial evidence. I don't see the evidence on the other side that I could say renders the board's evidence non-existent or insubstantial or anything. So that's my problem. My problem is that if this were a case of first impression, which I understand it's de novo review on the likelihood of confusion, but it's not de novo review on the underlying fact findings. It's substantial evidence. If I got to review it de novo, I would agree with you. These are not related goods, but that's not a de novo question. It's a substantial evidence question. So how do you overcome that? What evidence do you have in this record or why should we just entirely disregard the board's evidence that some companies sell them together? Your Honor, the other evidence that we could have produced is that there are some companies that only make candy. But we felt that the evidence that was being presented before the board was insufficient in the sense that the same evidence provided, in our opinion, helps to prove our point also that that is an exception to the rule. What you could also have done was pick a different name. And when you're picking the same name, presumptions go in favor of the original register. Admittedly, Your Honor, that is a possibility and we agree with you. But obviously our client seeks to protect that trademark and they have an interest in using that trademark in the market. And Your Honor, I understand your concern. And I'm going to talk about a specific evidence or exhibit that was presented by the board that I think is kind of troublesome in the sense of the conclusion that was reached at the end. In the decision, the Trademark Trials and Appeals Board, when evaluating an exhibit, it reached a conclusion and I'm going to read it directly from the board. It says, the examining attorney also submitted a printout from Yelp.com in which a Seattle user asked, does anybody know where I can buy liqueur filled chocolates downtown? And received more than a dozen responses, some specifically referring chocolate filled with rum or Kahlua, Baileys, Grand Marnier and liqueur. Okay. Then the conclusion that the board reaches with this exhibit is, the evidence supports a finding under the second DuPont factor that consumers are likely to believe liqueur and rum on the one hand and candy on the other hand emanate from a common source. My problem with that conclusion, and it's something that I defer strongly, is that to me, this is a clear example that the rule is not that candy and rum and liqueur are complementary goods because if a consumer has to go on the internet and ask where he can find those goods, it's because obviously they are not readily available everywhere you go. If you were going to a store and pick them off the shelf right away or to any supermarket, why would somebody need to ask? And also... Let me just tell you, I agree with you. I agree with what you just said and your interpretation of the Yelp thing. The problem is, again, substantial evidence. What I can't say is the board's interpretation to the contrary was totally unreasonable. If I got to make the decision, I would actually find in your favor on this point. But I can't say the board's decision to the contrary was unreasonable in understanding that with all of these other people weighed in with their comments, that those comments don't demonstrate what consumers understand. Does the one person asking a question demonstrate what consumers understand or do the comments that followed in demonstrate what consumers understand? And I can't say the board's decision that the comments are what demonstrates what consumers understand is unreasonable or not entitled to any weight. And that's the problem that you have. I'm just... I know that there's really not an answer to what I'm telling you. It's not really in the form of a question. I'm just saying this is what is bothering me about your case and why it's difficult for me personally to get to a reversal. Okay. Your Honor, I understand your concern. I understand your question. What I can say about that is that when we saw the evidence, we thought that in a way that evidence supported our position. And we obviously discussed the evidence. In a way, I know that it was pointed out at some point that what we did is criticize the evidence. What we were trying to do was not to criticize the evidence. It was to use it in our favor in the sense that, well, if this is what you are providing, then that serves to prove also... I take it as evidence and I take it as a failed face value. But to me, that supports my position also that what you provided really does not prove that these products cannot coexist in the market. And we also cited case law in support of our argument that, for example, the Coors case that it was for the Blue Moon trademark, that eventually that case was reversed and both Blue Moon was registered at the end of the day because the board found that although some establishments may sell beer and may even brew their own beer, but that does not mean that the trademarks cannot coexist even though one is for beer and one is for restaurant services. So I think... So we also felt that the evidence, the way that it was presented in light of the existing law supports our position. And that's what we understood. Do you want to save some rebuttal time? Yes, Your Honor. Thank you. Ms. Heber. Good morning and may it please the Court. This is a straightforward case where likelihood of confusion has been established on the two goods. The board properly found these marks are highly similar. I don't disagree with you on the similarity of the marks. And I think the board took into account the stylized C above and it didn't say they're exactly the same. So I don't have a problem with that. But my problem on the related goods is really, I don't know. I don't think of candy and liquor together personally, but I know that's not the standard. It's whether there's substantial evidence. But in this internet age, there is nothing I can't buy on Amazon. Nothing. And so the fact that the board, a trademark examiner, went online and happened to find a website or two that sold all of these products, does that really sufficient under the law? Should that be deemed sufficient to make them related goods? Nowadays, you do have these giant conglomerate websites that sell absolutely everything under the sun. So should that, as a legal matter, be sufficient? Just to go to a web and say, oh, well, I located a site that happens to sell both of these things. So, Your Honor, I don't think the sale on a website actually goes to related goods. It goes to the channels of trade. So the fact that they both could be purchased through the internet, through the same website, would establish similar trade channels. But the relatedness of the goods is about, at the end of the day, what you are concerned about is, are they of a type that consumers would assume come from a common origin, share a common source? They don't have to be the same. They don't have to be intrinsically related. I totally think everything comes from Amazon. Everything. So, you know, I don't know. Well, Amazon's the retailer. But here, the evidence that the examining attorney put in the record, and I would say the Godiva example is from Godiva's own website, shows a bottle of their Godiva-branded liqueur and it also shows them offering chocolates, candies, that are flavored or filled with liqueur on their website under the same mark. So for relatedness purposes, what we're looking at is, is there evidence that these goods actually are offered under the same mark to consumers? Not where they're offered. That's really channels of trade. But does the same mark, is it applied to these goods? And here we have evidence of Godiva, Tortuga, Bailey's, and Malibu Rum. All liqueurs on the one hand, and that same brand of liqueur is used for candies. Is there anything at all to the fact that this registration claimed liqueur, rum, rum creams excluding candy and ice cream products? I've never seen one of these excluding things. I don't know how often that happens. What is the legal significance of the fact that this attempt at registration sought to expressly exclude the very thing that you said is the problem for them? They tried to exclude it and say, we are not ever going to claim our mark on those products. What if anything, how does that affect this analysis, if at all? It doesn't affect the analysis because you have an unrestricted registration. And so the normal rule is that where you have a registration that covers candy, it covers all types of candy. And there's no dispute here that there is a type of candy that is filter flavored with liqueur. Oh, you mean the actual registration which covers candy? Yes. But the fact that the applicant has said, my mark will never be used on candy, you don't think that that affects this likelihood of confusion analysis at all? It does not here. If you had a restricted registration that said perhaps that they'll never make candy that's flavored or filled with liquor, that is something the board would have to take into account. And then you have perhaps more of a situation like was present in the M2 software case where you had two companies offering software under the same mark. But the IDs themselves, because we have to look at what's the scope of the registration for what the words in the registration in the application cover, that full scope. And where there's no restriction, you have to give it full effect for everything. Where there is a restriction, you can take that into account. In the M2 software case, that's what the court held, that there was different industries and nature of the software. And in both the application and the cited registration, and that mattered to the analysis. But here you have unrestricted candy. It includes candy that can be filled with liquor. I would, in a scenario like this, where suppose there are a couple of what I will call specialty retailers, like Godiva. I'll say that's, you know, I mean Hershey's isn't selling booze, right? You know, like specialty retailers. I don't know what I mean by that. I guess I just mean not everyone who is selling chocolates is also selling alcohol-filled chocolates. There's a few people who are selling candies, which you found. And they're really like these very high-end, like Godiva kind of sellers that are appealing to a slightly different market than the average chocolate bar buyer, I think. Maybe I'm mistaken. But in any event, my question to you is how does an applicant who's seeking to show that just because you could go on the Internet and find a couple of high-end individual retailers that do happen to sell both, that's not indicative of consumer understanding of the market as a whole. How do they prove the negative to a trademark examiner who found one or two websites where both things are sold under the same brand, not the channel of trade argument. But do you understand what I'm saying? How could you go about proving or making a case that that's not the case? These are specialty people. Like, you know, if they introduce evidence that no, here are 100 different alcohol manufacturers, none of whom sell candy. So yes, you found three that did. But here's evidence on the web of 100 different label brands for alcohol, none of whom sell candy. 100 beats three. Like, is that a way they could do it? I'm wondering, how could they build a case that could contravene this kind of fact-finding? Sometimes it might not be possible, and sometimes it can be possible. But there's certainly ways that they can try and rebut and challenge the showing that the examining attorney made. And an example, I guess, would be in the Coors case. Now, I'm hesitating because this isn't a numbers game, right? The fact that it might be a niche market or there's only a limited number of consumers that might have this understanding doesn't mean that there's not going to be confusion likely. Wait, no, no, no. But I don't think I agree with you on that, right? Because we're trying to look at consumer confusion in the relevant market, right? So if their brand is more like Tito's than it is like Godiva, wouldn't the fact that Tito's doesn't sell candy be more relevant to analysis of confusion than the fact that Godiva sells both candy and alcohol? I don't think so, Your Honor. I think it has to go to what the evidence shows about consumer understanding and expectations in the marketplace generally. What consumer and what marketplace? Here, really, it's not restricted to anything beyond the adult population. Because if you accept that to buy alcohol you have to be of a certain legal age, depending on the state where you are, that's the consumer group that would be the overlap here. Well, I'll just tell you. I've bought, and I know none of this is relevant to my decision-making in this case, but I've bought Godiva chocolates hundreds of times for people's gifts. Until you told me today that they also sell some liquor-filled thing, I never would have guessed. I'm not interested in purchasing it, but I never would have guessed that they did. I didn't go looking for it. What I'm worried about is a trademark examiner identifying via the capacity of our Internet certain extraneous examples that really don't represent what the marketplace full of consumers would understand and using them and what is the mechanism by which an applicant can show that those three things are not indicative of the marketplace or consumer understanding. I think there's a few things, and the Coors case is an example of where the examining attorney put forth what was a prima facie case of relatedness, as they did here, and the applicant came back and said, hold on. You have a situation where it's restaurant services and beer, and the court's case law had held that you had to have something more than just the fact that restaurants serve food to establish relatedness in that instance. But the Coors applicant came back and said, look, here's the restaurant industry as a whole, and the examples of where restaurants also brew or sell their own beer is a tiny, tiny fraction of the percentage of all restaurants. That was compelling to overcome the examining attorney's showing. But you told me a minute ago numbers don't matter. I said if they were able to show 100 different liquor companies that don't make candy, and you kind of rejected that idea. Can't the numbers possibly matter? Maybe not in every case, but can't they? I mean, that's kind of what you just described in Coors. Well, I think it's a little bit different because it was industry data, not just I have 10 examples, you have 20 examples. We don't want to get into a numbers game because we don't want examining attorneys cluttering the record with hundreds of examples of things. It's not necessary to establish the premise and the principle. Maybe it is necessary, though, once somebody else puts on a sufficient amount of evidence that what the examiner found in his or her one or two examples are not indicative of the marketplace. That's exactly correct. But here we have a completely unrebutted showing. Another thing that applicants can do is surveys, for example. The office can't, but applicants can, and we have to consider that evidence. So surveys. Okay, and would another way to do it, like in this case, so I have absolutely no idea since I don't usually consume hard alcohol and I don't like chocolate, so I'm probably the least knowledgeable human being on any of this. That being said, what if they were able to show, for example, that nobody ever puts rum in candies, they always use vodka or tequila or gin, because their application is limited to liqueurs, rum, and rum creams. So suppose there were examples out there of alcohol being used in candy, but could they make an argument, not the type of alcohol that we're claiming for registration. There's nothing. I mean, is that the kind of argument they could also use to rebut an examiner's finding of relatedness? They could make the argument. I'm not sure if it would be compelling, depending on the facts in the case, because in all of these cases you always have this kind of weighing of, where you have really high degree of similarity between the marks, you need a lesser degree of showing of relatedness. And the converse is true. If the goods are identical, you need a lesser degree of showing of the marks. And so when you're looking at the whole likelihood of confusion question, these things get weighed and evaluated in that context. So I think it's possible, but I don't know if it would change the outcome. The other thing I would add, in preparing for argument, I did go back and look at other cases just to confirm that this sense of relatedness for these kinds of goods has existed for a long time, grounded in case law findings as well, going back to 1965, where this court's predecessor held, now they were identical marks, but liqueurs and macadamia nuts under the marks, Royal Hawaiian. The goods are closely related in use. That was the basis there. There was another case in 1966. Wait, what was closely related? Liquor and macadamia nuts? Liquor and macadamia nuts. It was Castle and Cook v. Seagram at 346 F. Second, 621. In other words, you're having a drink, and there's a little bottle, a dish of nuts. Yes. Do you expect them to come from the same source? Yeah. The board's finding of no likelihood of confusion was reversed in that case, and also in the case of Schenley v. Fournier, which is at 357 F. Second, 395, and that's from 1966. There the registered mark was three feathers in a design format for whiskey, and the applicant's mark was two feathers with some feathers designed for pickled, brandied, spiced, and preserved fruit. And the court found that the relationship between some of the products there, the whiskey and the brandied fruit, to be such that the average purchaser would be justified in assuming and would be likely to assume that the goods are of common origin. So when we have evidence like this here, that the same mark, these goods are offered under the same mark to consumers, that's the kind of relatedness evidence that's very solid and that we care about here. So unless the court has any further questions. Thank you, counsel. Mr. Pomares has a little time left, three and a half minutes if you need it. Thank you. Yes, I just have only a few notes. Definitely the consumers in this case is an important factor. A person that comes to my mind, not that I'm an avid consumer of alcohol, but when somebody goes to the store to purchase a wine or a whiskey or something, I think to give an example, for example, you could have a black label, which I actually say is a pretty famous trademark for whiskey. If I found, and this is a hypothetical scenario, if I saw a candy named black label, necessarily I do not necessarily have to associate the same wine because I think they're in different channels of trade. Why do I bring this sort of example? It's because I think the consumers are specialized in a way. People that consume or are sophisticated, the people that consume alcoholic beverages, especially these kind of products, we feel that they are somehow specialized. We have made that argument in our brief, and I think obviously there are plenty of decisions that talk about products that are consumed by people that have a higher degree of specialization. We feel that alcohol and candy are so distinctive in terms of the kind of goods that they are, and the people that consume alcoholic beverages such as whiskey, Baileys, Kahlua, that they would not be confused if they find, obviously if they encounter a product in the market that is exactly the same, the same colors, the same. They might think it comes from the same source, and the examples that were provided by the trademark examiners are really famous. Trademarks Kahlua, Baileys, all of those are really famous and well-known trademarks in the market. So I wanted to point that out. Can I ask you just a quick question on the record? Was there anything in the record to indicate a dispute about whether chocolates are candy or not, or was that accepted? No. What we did find, and we present arguments on the record, is that one of the products that was identified in the trademark registration for Cañaveral, not C. Cañaveral, which is avalanche, was ice cream. And ice cream, there are decisions that say that ice cream, which is a dairy product, are non-related to alcoholic beverages such as Kahlua and all those, or liquors. And there is case law that specifically has established that those products are unrelated. In terms of chocolate, no, I did not find any case law that ruled in that sense that they're unrelated products. But ice cream, yes. And that was not mentioned in the appeals brief for the examiners. Thank you, Counsel. The case is submitted.